The Honorable Judges of the United States Court of Appeals in and for the Seventh Judicial Circuit, hear ye, hear ye, hear ye. All persons having business before this Honorable Court are admonished to draw near and give their attention, as the Court is now sitting. God save the United States and this Honorable Court. Good morning. I see Mr. Hillis and I see Ms. Boyle. Can you both hear me? Yes, Judge. Yes, Your Honor. All right, then we can proceed. This morning's case is the United States v. Janhoi Cole. Mr. Hillis. May it please the Court, Ms. Boyle. Police cannot seize and question a driver as part of a general interest in crime control. Although pretextual stops are permissible under WRAC, the Fourth Amendment requires that every stop be reasonable. Rodriguez teaches that a seizure is unreasonable if an officer unnecessarily prolongs, measurably prolongs, a stop beyond what's necessary to complete the mission or for a purpose that is safety-related. So, Mr. Hillis, I was struck by something you said in your supplemental filing, which I understood to be a statement on your part that the problem in this case wasn't so much that Trooper Chapman asked a question about travel, it was the prolongation. I mean, that the trooper could have said, where are you going? Or, how are you feeling today? Or, are the Bears ever going to win a game? Or anything of the sort to strike up a pleasant conversation? And that you are not taking the position that there's something particularly suspect about travel plans. That's right, Judge. So, we don't think it's a striking proposition. We could have tried to hew ourselves to a very strict reading of Rodriguez. But we recognize there are matters of routine and valuable things to be done by setting context and to put a motorist at ease. But those have to be very brief. They should happen at the outset. And to allow that, we wouldn't say measurably prolongs the stop. However, the prolonged nature of questioning along that line. But the prolonged questioning, in other words, I still, I guess I just want to If the difference has to do with questioning about travel plans, that's one thing. If the difference has to do more with the question whether as the conversation went on, reasonable suspicion built such that it was okay to hold off and wait for the dog to come. That's a different issue. I mean, you know, maybe it did build, maybe it didn't. But it's a different issue from the question of the topic of the conversation. That's fair, Your Honor. So, topically, we would say that the officer can, as an ordinary course, introduce himself and say what the purpose of the stop is, make a brief comment of that type. But the context of Rodriguez is really about the prolonged nature of the stop. Asking lots of questions, of course, prolongs the stop. But there's a further problem. Rodriguez does not allow officers to now use the accident of the traffic stop to engage in public suspicion. Can I clarify, please, and pick up on what Judge Wood was asking about, so I understand your position. I understood you to be saying that one or two questions about, hi, how are you, where are you going, are okay because they're travel plan or itinerary questions are part of the mission of a traffic stop as defined in Rodriguez. Is that a fair characterization? It is mostly fair. We would say that the questions are not categorical. And so, the Fourth Amendment doesn't deal well with bright-line rules. It is a fact-specific inquiry. So, application of Rodriguez to this case, Judge Seidman, would look to what the nature of the traffic stop. And here it's tailgating. The officer knows what the general legal principle, Mr. Hillis. Do you then agree that at least some preliminary questions are ordinarily part of the mission of a traffic stop to use the Rodriguez language? Or is your position that, hey, how are you doing, where are you going, is acceptable just because it's a pleasantry to put the driver at issue, which is what I think you said in your supplemental brief? I don't know that there's really a distinction between the two things. If putting a motorist at ease and setting the context. I think legally there is a distinction if it's part of the mission of the traffic stop because then that falls squarely within Rodriguez and the legal framework of what Rodriguez has set forth is okay during a traffic stop. If that's true, Your Honor, and I'll accept the premise just to answer the question, the problem then is about the extension, asking question upon question where the officer in this case has a tailgating stop that knows the cause. Mr. Hillis, can you tell me exactly where in the officer's questioning in this case it became unreasonable? With what question was he supposed to stop, particularly given your client's answers and given all the information that he knew before he initiated the traffic stop? Sure, Judge. So he knew a lot of things that should have made this a shorter stop. But when we're at the 518 mark in the video, some of the questions about travel become repetitive and it's as if they're pulling at a thread to pull apart the fabric of my client's purpose. But really at the 544 mark, we have questions about where is he going, what is his job, he's a chef. I don't know that a person's nature of their employment is ever pertinent to a tailgating offense that we could say that questions about why somebody is a chef or any other occupation are pertinent to the mission of the stop. Isn't the problem, Mr. Hillis, if you're using that five-minute mark, isn't the problem that by that point Mr. Cole had already mentioned seven states within five minutes in the circuitous route? Doesn't that merit the follow-up that Chapman was making? No, Judge, because if we're to allow that, we're going to erode what the restrictions are in Rodriguez. Was it really a circuitous route? I mean, he consistently says, I started out in Maryland, went through Cincinnati, over to Colorado, and I'm going back again. Judge, you're exactly correct. He didn't. He didn't give any inconsistent answers. He gave a route that an officer may have thought was peculiar, so we have a hunch now. And the officer is now from there fishing for reasons to come up with reasonable suspicion to build a criminal investigation that has nothing to do with those questions that are not necessary because the answers, the travel questions under SOCLO or any of those cases, my client has not given inconsistent answers. Mr. Hillis, you said that at 517, that's when the questions started to become inappropriate. The first real travel plan question that was asked by the officer wasn't until 524 when he said, where are you headed today? The questions prior to that were your client's response to the officer's question of, you got an Arizona driver's license here, but you got a California license plate. That was at 430. And then your client is the one who offered, I'm a chef, I spend most of my time between Los Angeles and Maryland and New York at work, but I genuinely had a job in Arizona and I genuinely keep this expiration date. And then they went back and forth about that. So it wasn't until 524 that the first real travel plan question came from the officer. So I don't think your statement about 517 being problematic works. Judge, if I may, at 517, the officer's asking questions about things that he knows the answers to largely, whether the insurance is in good order, where the license is, vehicle registration. There's nothing about insurance at that point. At 516, he says, what's your first name? Judge, at 544, he's asking about my client's occupation. It has nothing to do with me. So let's be generous to the government. 544 is a problem. I'm not being generous. I'm reading from the transcript. I have the exact times of when things were said. Sure, Judge. I'm saying, I'm trying to be generous to the government. At 544, we would say asking about the type of employment is far off. We don't allow under, even for purposes of this en banc, which is to discern the appropriate nature of travel plan questions, are we also to have categories for work, employment history, vehicle history, family history. These are all things that are all addressed by the officer as part of his inquiry and it's a fishing expedition. But Mr. Hillis, the Fourth Amendment, I think we all agree, is grounded in reasonableness. And the questions prior to the question, where do you work at? In response to where are you headed today? Your client is the one who said, Maryland. My boss is in Maryland. I'm a chef. So why wouldn't, not as a categorical, I'm sorry, Mr. Hillis, why not as a categorical matter, but why isn't it reasonable to say that an appropriate follow-up response, where do you work at, is acceptable? So Mr. Hillis, as you answer that question, I want to get back to the legal standard too because what I'm still wondering is whether what this case is really about is the question whether Trooper Chapman, as he sees the Arizona driver's license and the California plates and Mr. Cole volunteers his connection with Maryland and they're in the middle of Illinois, you know, is on the same totality of circumstances test that we always use for the Fourth Amendment, is it really just that as of the times after the five minute mark, five minutes, 44 if you want, is it that enough has happened to allow the trooper to pursue this or is it, are we still in the kind of mission of the stop that Rodriguez is talking about, which was limited to very concrete things? Judge, the problem is that the officer, by going beyond what Rodriguez said, should know that he's in worrisome territory. But if he does it because he thinks it's weird to use a non-legal term, that this guy has these multi-state connections, maybe he should, maybe he shouldn't, I'd be glad to go down the list of bullet points the government has furnished because some of them I think are completely irrelevant and some of them may have been something to trigger a rational suspicion. Depends. But then you have to apply the totality of the circumstances test. So under the totality of the circumstances, my client gave consistent answers that accounted for his travels and there was nothing to beg for follow-up questions, Judge. So under a totality of the circumstances, there wouldn't have been anything for the officer to continue to engage questions that go beyond what the mission of the stop is. He had all that he needed to issue the ticket. Did Trooper Chapman testify to when he was asked about what he was doing during this stretch of time rather than pursuing the ticket? So he was making sure that my client's story made sense, that he gave a satisfactory explanation to account for why he was traveling as he was traveling. And as the court had noted in the now vacated opinion, that's not how this works. You're not required to account for why you're traveling and how you're getting there to the officer's satisfaction. As a motorist, you have the right to be on the roads. You have a fundamental right to travel. We're now allowing officers, if we were to engage in this way, to insist that they give satisfactory answers. The officer's satisfied, not constitutionally satisfied. My client had a right to travel. The officer seized him and he was subject then to limits by Rodriguez and he exceeded those. And the travel plan... To put that statement of the officers in context, Trooper Chapman testified that he was struck by the fact that the car had been registered by a third party, which was unusual. And your client's comment that he'd been driving it on a buddy's insurance and registration and that it was coming from California, had a different registration, had a different license. Why isn't the trooper's really part of ensuring that vehicles on the road are operating responsibly when he has all these questionable connections going on? I'm not certain of anything in that catalog that showed that it was unsafe or unreasonable to operate the vehicle. He had everything that was necessary. If the officer was suspicious, he had to have reasonable suspicion to continue the questioning. What you just spoke about, Judge, it's not reasonable suspicion. The government didn't argue that those things were sufficient to establish reasonable suspicion. I wasn't suggesting reasonable suspicion. I was suggesting part of the mission of the traffic stop. But they weren't part of the mission of the traffic stop. So the mission of the traffic stop was to first talk about tailgating. If there was anything that the officer had to say about tailgating, he could have said so on the record. If these were pertinent to public safety, he could have said that on the record. This is an important thing that is not... The government never argued below that these things were relevant to the mission of the stop or necessary. They were pertinent to public safety. We only have now on the en banc the time to make those arguments and to establish that evidence, Judge, not through beats and pauses, but through testimony by the officer was in the district court. That's what they did in Lewis. They had every ability to make those same statements. But in fairness, Mr. Hillis, that wasn't the suppression hearing. The focus of the suppression hearing was really on the initial traffic stop. The focus was on Rodriguez. It was for the government to meet its burden, to show why these questions were necessary. And they didn't do that just like in Lewis. In Lewis, they did. Here, they didn't, Judge. They could have made a better record. They didn't. The government even goes as far as to say that long pauses show that the officer was working on the ticket. Long pauses show that nothing's being done. Well, we don't know. Actually, I disagree with that. I think we just have a lacuna in the record. There are long pauses. Perhaps the officer was working on the traffic stop. Perhaps the officer was staring out the window thinking of the next question he wanted to ask. We have no idea because there's no finding of fact on that. And it may be important. That's true. Should the government have asked the police officer that question? Absolutely. And did not. More of the searches are per se unreasoned. The government to meet its burden, it absolutely should have asked those questions to Judge Roedner. It knew enough to put those things in the record in Lewis. It should have known that. That is what you believe is the difference, do you not, between this case and Lewis? It is the difference between this case and Lewis and virtually every other case the government cites. Colasso, Cortez, Garner, Lewis, Murillo, Salgado, Reyes, Hernandez, Ruiz, Smith, Yancey, Leon. In those cases, there was either reasonable suspicion and then travel plan questions were asked, which is fine. Once you already have reasonable suspicion, you can be painstaking. Or the officer was simultaneously processing the ticket while asking the travel plan question, which again is fine even under Lewis. So the problem here is the record. And the government could prevail in Lewis because of the record, but it should rightfully lose here because of the record here that they had the opportunity to develop and did. Mr. Gillis, if I may, the case is here on bank, obviously, and that requires us to address the line drawing legal issue that's question of what the record does or does not say. And I'd like you to address yourself to the line drawing question and what the rule is that should emanate from this case. What is the rule that you're proposing regarding travel questions? And bear in mind that while Fourth Amendment cases are context specific, as you said at the opening of your argument, some Fourth Amendment cases, like this one, that raise issues that are so pervasive, what questions are permissible under that carve out in Rodriguez for questions that are pertinent to the mission, ordinarily pertinent to the mission of the traffic stop and more or less as a categorical matter are permissible? How would you draw the line here? Is the initial travel-related question permissible, but no follow-up question is permissible? We need to announce a clear rule so that officers in the field know what they can and cannot do in this context. And I'm trying to get the positions of the parties pinned down on what the rule should say and how it should be taught in the sentence. That travel plans are not per se permissible. So they will then be a fact-bound inquiry specific to the case. And the nature of the stop will be informative on this judge. And here the government has never argued that this particular stop necessitated any follow-up questions of any type. Okay, and I'm trying to get away from what was or was not argued here, what was or was not perhaps waived, what the record does and doesn't say. We're sitting on we have to announce a rule. Other circuits, notably the 5th and the 11th, have announced sort of per se rules that travel questions are fine under the Fourth Amendment. Other circuits take a more nuanced approach. We need to decide. Well, we should have a nuanced approach as well and ask to respect them. So Rodriguez says what is categorically allowed. Beyond that, it has to be related to the mission for public safety. So would you agree, can you give an example of something? I mean, I think somewhere in the brief somebody said if the stop were for blowing through a red light, then you might want to know what the travel plans were. Are you trying to get a pregnant person to the hospital? Or were you trying to, you know, just get where you wanted to go in a hurry or whatever? So that might be pertinent. Tailgating might not be. I mean, on both sides that would show why the route mattered. There are. So as a matter of public safety, for instance, Judge Wood, if the officer thinks that the individual may be impaired, there are reasons to ask follow up questions. And so here where there's no, excuse me, by comparison, in a tailgating offense where there is no suggestion of impairment, it would be unnecessary to ask those questions. We are not trying to restrain those questions. Can I just qualify? I think you mean ask those questions in a way that prolongs the stop longer than would be necessary to write the ticket for the tailgating. Because they can talk about anything within that time frame, I thought. And that's what saves the rule of law. They can talk about anything within the time period reasonably necessary for the stop, whether it was a pretextual stop, whether it was, you know, a stop commanded by angels, you know, whatever kind of stop it was. That's right, Judge. So anything that doesn't measurably prolong the stop, they can do. Anything that is related to the mission of the stop, they can do. We're not asking for a rule that's different from Rodriguez. We're not asking for an expansion of Lewis. We're asking that the facts of this case conform to what the rules already are. And I don't know that we have any need to adopt a brighter or broader set of parameters that the government is unable in its brief to show what traffic stop would not invite travel point questions, much less how is it that we're able to ask about employment and other things. So, Judge Sykes, the answer that I will give you and for the rest of the court is Rodriguez talks about things that are categorically permissible. The mission of the stop then dictates whether questions are necessary beyond that. And that is as much as we can say. The nuanced approach of other courts are fact specific as well. And so the outcomes will be different. So the rule that you're, just for clarification, the rule that you're proposing has nothing to do with the nature of this stop and has everything to do with the length of the stop. The rule has absolutely to do with the nature of the stop because the mission of the stop will dictate the nature of the questions that are relevant and pertinent to any further inquiries by the officer. It is always going to be fact specific based on the nature of the stop. The mission of the stop, Rodriguez says, is the sentinel event, right? So we can ask questions based on what the nature of the stop is in its mission. And that is consistent with Rodriguez. We do not allow questions to go far afield because then we do have a problem under Rodriguez, Judge. We're allowing stop to become an event for the officers to develop reasonable suspicion on questions that are not pertinent, not relevant to public safety or to the mission of the stop. To the extent that you're drawing the line at suspicion of impairment, that strikes me as far too narrow because many moving violations where there's no suspicion of impairment relate to the safety of the traveling public and seems to me to justify greater inquiry into travel plans. Judge, if that's so, it is just for the officer to explain that in satisfaction of the district court and it's not going to be easy for this court to draw a better line than what Rodriguez has already said about the mission of the stop. Mr. Willis, can I... I'm sorry, go ahead, finish your thought. I'm done, Judge, please go ahead. Okay. We're talking a lot about Rodriguez. In your view, is the Supreme Court's decision in Arizona versus Johnson pertinent to some of this line drawing? Because in Johnson, as you'll recall, a car was pulled over for an outdated registration. Lamon Johnson was a backseat passenger. One of the officers ordered him out of the car to question him for the purpose of questioning him about his gang affiliation, not about the car registration or anything. So might we take the court didn't have any trouble with it. In fact, the pat-down, the follow-up pat-down was found not to be problematic. So might Johnson not inform some of the line drawing in this area too? Less so, Judge, than I think what Rodriguez is later established. So Rodriguez was decided with full view of what Johnson did. It said categorically the four things that are permissible and beyond that allows for determinations based on the two categories that I mentioned, the nature of the stop mission. So if in Johnson, you could say that there was a need to do that and it related to the mission and comports of Rodriguez, you'd be fine. How is there a need to ask Lamon Johnson questions about whether he's affiliated with a gang when the purpose of the stop was to pursue the outdated registration? Judge, if Rodriguez has narrowed Johnson in any regard, I think that might be an inference, but they didn't say that in Rodriguez. So I'm not making that argument. But is there any indication that that question prolonged the stop? That would be the central issue, Judge, and I just don't know that they determined that in Johnson, but that is the relevant benchmark in Rodriguez. Unless there are further questions, I deserve to balance my time. That's fine. Thank you. Ms. Boyle. Good morning, your honors. May it please the court, counsel. My name is Catherine Boyle on behalf of the United States. Travel plan questions will generally be permissible within the mission of a traffic stop. Precedent from both the Supreme Court and this court support that conclusion and the ultimate touchstone of the Fourth Amendment, reasonableness. All right, so Ms. Boyle, you use the word commonly, and I want to know whether it's the position of the government that travel plan questions belong in the list that the Supreme Court enunciated in Rodriguez, or whether there are some kinds of stops that, aside from the conversation within the boundaries of the purpose of the stop, are there some kinds of stops that would not support an independent inquiry into travel plans? Maybe I'll put it that way. Yes, your honor. We're not asking for a per se rule here that travel plan questions are categorically permissible. We recognize that the Fourth Amendment requires a reasonableness evaluation. We say generally because it may be hard to imagine a case where a travel plan question or two wouldn't be permissible within the mission of a traffic stop, but we say generally because certainly it is possible. If somebody thinks long and hard enough, they may come up with a travel plan question that doesn't seem appropriate within the mission of a certain type of stop. Let me ask you, is the reason travel plan, in your opinion, was appropriate here because Mr. Cole gave Trooper Chapman the Arizona driver's license and the playthrough? All of these things, of course, Trooper Chapman knew, but anyway, this sort of mixture of states, is that what opens the door into this much more granular discussion of travel plans? Or if somebody gets a ticket for parking by a fire hydrant, do you go into travel plans for that? What do you do? Well, first of all, I believe, particularly in the context of a stop like this, an initial travel plan question or two will be permissible. Because it doesn't prolong or because it's relevant to the suspected violation? I've noticed, by the way, just for the sake of putting this on the record, we are assuming for present purposes that Trooper Chapman did have probable cause to pull the car over for the tailgating offense. So we're not focusing on part one of this. We're focusing exclusively on part two, right? Yes, Your Honor, that's correct. Well, first of all, we believe that these initial general travel plan questions will be within the mission of the stop in this case. And the follow-up question... Why? Can you please explain why? I mean, what exact facts? I'm looking at your brief. It really goes on for a while. Pages 31 to 35, you have all your bullet points of what Trooper Chapman is learning over the course of time. Some of those, I think, are completely irrelevant. But some of them, you know, maybe the trooper was well advised to wonder about them. I think this Interstate 55 being a known drug trafficking corridor is something I wish the government would stop. I have something from the National Drug Intelligence Center that shows the and the entire state of Illinois is a drug corridor, as well as the entire state of... I mean, almost the whole country is a drug corridor. So it bothers me that the government relies on this. Well, I'll tell you the fact that somebody trails I-65 and sees all the arrests for drugs is true for I-65, I-55 in Illinois, the Indiana toll road. And the entire state of Indiana is also a drug corridor, as is all but a little corner of California, if you look at this map, which is, again, produced by the National Drug Intelligence Center of the Department of Justice. Well, your honor, it may be helpful to sort of focus in on exactly what happened during the stop and exactly what's being contested in determining whether the trooper's questions were appropriate at a particular time. As you noted during Mr. Hillis' argument, Mr. Cole is not challenging the initial portion of the stop in which the trooper asks for his license and registration, he explains the violation, he asks him to come sit in the car. And Mr. Cole really doesn't even challenge the permissibility of asking him about the discrepancy between his Arizona driver's license and California registration. And it is an answer to these questions about the Arizona driver's license and California registration that we start to hear a number of states say that, you know, you have a person who's in Illinois with an Arizona driver's license with California registration who's saying that he splits his time between California, Maryland, he may be moving to Florida. And how is all that relevant, Dale Deating? I mean, I'm, we go back to a right to travel. And I'd like to go back to Chief Judge Sykes' question, well, to Mr. Hillis. And as we're trying to, at least, I think, see if it's possible, it may not be possible to formulate a rule of law here. And when you say these questions are generally permissible, meaning I believe that they are generally permissible as an independent basis for prolonging the stop, right? That's your view? We believe that they are within the mission of the stop. So when something is within the time spent on those doesn't count as prolonging the stop, right? Yes, sir. Let me go back to what Judge Wood was asking. Can you give us an example? You say you don't want a bright line rule, but can you give us an example of a situation where you believe that would not be reasonable permissible to prolong a stop for that purpose of ascertaining that the police officer is satisfied with what he or she is being told by the driver of that itinerary? Well, I think we want to go back to Rodriguez for a moment and note that Rodriguez does have a short non-exhaustive list of what is acceptable. Yes. Could you give us an example that takes you away from a bright line rule? We think it would be difficult to think of a traffic stop where it would not be permissible to ask an itinerary question or two. And the reason for that is because... And to then prolong the questioning until the officer is satisfied. Well, of course, it would not be permissible for the officer to continue to ask questions where there's no ambiguity in the defendant's answer to an initial travel plan question. Let's say you have an individual, ice cream in sight, has a broken taillight on the way home from the grocery store, apparently, and the officer says, where are you going? And they say, I'm heading home, I just went to the grocery store. You see the bags, everything's very clear. In that situation, perhaps it might not be appropriate for the officer to follow up with additional questions. You can be arrested when there's probable cause for certain violations. However, we believe that where the answer is, the answer to a general initial travel plan question is non-ambiguous, and it could potentially end up prolonging the stop for the trooper to continue asking additional questions. But that's not the case here. Wait a minute, wait a minute, Ms. Boyle. I'm disturbed in some ways that we're talking about travel plans, because I feel that we could be having precisely the same conversation if the question were whether an officer is allowed to raise a health question with the driver. We would say, well, of course, officers always have an interest in whether drivers are impaired while driving, but can the officer pursue the health question? When was your last doctor's appointment? Are you wearing glasses that are helpful to you? What about a hearing aid? Whatever. Can they go on for an hour about health if there's nothing else? I think this all depends, as you just said, not on whether the topic was okay, but whether the answers begin to support some sort of reasonable suspicion that would itself justify a stop for purpose unrelated to the traffic infraction. He thought this guy was dealing drugs, actually. Turns out he was right. But I'm concerned that we need to justify a stop that goes beyond the mission of the tailgating offense, or the broken headlight offense, or the failure to wear a seat belt offense, or tinted windows offense. I mean, just a zillion traffic offenses you can think of. And I'm still not 100% clear in response to Chief Judge Sykes' opinion where the government wants a rule that says, you know, we get to ask about travel as long as we want to. It can go on for three hours, you know, because travel is always within the mission of a traffic stop. That's not what we're saying, Your Honor. We are saying that, generally speaking, these initial travel plan questions will be appropriate. And when the answer is, in some way, unclear, ambiguous, non-responsive, then it's appropriate for the officer to follow up. And that's still within the mission of that stop. Lewis provides a great example here. You have an officer who says, where are you headed today? And he says to pick up his son. This court naturally viewed that answer as somewhat terse. So they said it was okay to have a follow-up. Where? The defendant says school in St. Louis. I'm kind of reminded of the drug courier profile. Is the answer too terse? Or does it run on to provide too much information, suspiciously so? Like the drug couriers who pay with cash or with credit card or in advance or last minute. I mean, that can go on forever. Your Honor, we don't believe that the officer's questions could go on forever here. There's certainly a point at which he... Why not? If it's within the mission of the stop, it seems to me there's no outer limit. Would the officer be entitled... There were no passengers in this fire, but would the officer have been entitled to talk separately with passengers about travel plans? Your Honor, I believe they would. The case law generally indicates that it's appropriate for the officer to ask a question of a passenger. And you'd want to ask separately. And we've seen cases where people have not had their stories straight and there've been other suspicious circumstances. But it's beginning to sound an awful lot like custodial interrogation on itself. Will the officer satisfy? Your Honor, we don't believe that this is akin to custodial interrogation. It's really just asking these general initial travel plan questions in cases where there is a clear satisfactory answer. The officer would proceed with the rest of the interrogation. There certainly are outer limits where a clear answer is provided. And to the extent Judge Wood had mentioned these questions going on interminably, well certainly if the individual continued to not answer the question for a significant amount of time, you would be a reasonable suspicion. But you'd have to satisfy the officer about your travel? I think if you provide a non-responsive or unclear answer, the officer is permitted to follow up. I believe that is a case where the officer asked about six or seven questions in total throughout the course of the stop on these travel plan issues. And this court deemed it entirely permissible given the terse nature of the answer. The court did say in Lewis that the stop wasn't prolonged, but the court also advanced an alternative holding where they said that these questions were appropriate. Ms. Boyle, where do we draw the line? If the test you're advocating for is that travel plan or itinerary questions are generally permissible because they're part of the mission of the stop, where do they become not permissible? What's the test? Or is it just this is the Fourth Amendment and it's dictated by reasonableness, which will have to be decided on the facts of a particular case? The Fourth Amendment is dictated by reasonableness and it will need to be decided on the facts of the case. However, it is important to note that you could see at a certain point travel plan questions going on too long or becoming too invasive where the person stopped has been providing perfectly clear answers. But we need to be careful here not to, by sticking to the non-exhaustive list of questions advanced in Rodriguez, we don't want to advance a categorical rule in the opposite direction suggesting that travel plan questions are never permissible or rarely permissible. That's just certainly not the case, especially when you think of Rodriguez's language, not only with permitting these certain checks of driver's license and warrants and registration and everything. It also says that one of the goals of the traffic stop is to ensure vehicles on the road are operated safely and responsibly. And in making that evaluation, it is generally going to be permissible to ask a travel plan question or two. So back to the example though of until the officer is satisfied, is the government arguing that these questions are okay even if they go on for an hour, if it takes that long to satisfy the officer? I don't know how that could pass a reasonableness test. We think that there is an outer limit at which it would seem the questions have gone on too long. However, if the officer was continuing to pursue very unclear questions for an hour, you would already be at reasonable suspicion and thus the stop can be delayed. One of the things that concerns me about this Boiler, the way the officer was asking these questions. Obviously, this is not idle chitchat. This really was an interrogation where he's going back over the same material time and again, asking the questions a little bit differently, familiar techniques for police interrogation to try to trip somebody up. And obviously, he eventually did. But the question is really, under what circumstances is that kind of repetitive questioning going to be permitted? And I got to say, your idea of a mom with melting ice cream in the backseat certainly is colorful, but doesn't give me a lot of comfort on limits here. It seems to come pretty, pretty close to a bright line rule. Well, your Honor, I want to just take a step back here as to your point about whether the officer seemed to have been engaging in an interrogation. And I think an important point is we're really talking about a very small number of questions over a relatively short portion of the stop, from a little partway after minute five, about minute 524, through arguably through minute seven or eight before you end up with reasonable suspicion based on Mr. Cole's answers to these questions. So this is not a lengthy interrogation. This is very akin to the questions asked in Lewis. And the courts have very long. They were clarifying some very confusing answers on Mr. Cole's part. And they related to a discrepancy initially between his driver's license and registration, which frankly, is a law violation. Once you move to a state, you're supposed to have switched your driver's license to that state. And you have an officer here who's trying to make sure that all of these things are in order, that vehicles are being operated safely and responsibly on the road. And the fact that he spends a couple of minutes, maybe three, four minutes at most, asking these questions seems reasonable under the Fourth Amendment. So can I just say, I think you've just said something very important, which is that it's the government's view, what I understand you'd be saying, that as of about minute seven or so, I think before they go to the gas station, enough is on the record to create reasonable suspicion. And we are no longer inside the time protected by Rodriguez. And we are in a different world where the trooper now has reasonable suspicion that at a minimum, some minor traffic and registration offenses might have been committed and maybe something worse. And then he doesn't want to go to the gas station, but he acquiesces because he doesn't have much choice. But if you are placing everything that happened after about minute seven under the reasonable suspicion heading, this case looks a lot different from if you're trying to just justify the traffic stop itself all the way out to the end of this lengthy video that we all looked at. That's correct, Your Honor. We believe reasonable suspicion existed by about the seventh or eighth minute of the stop. I can go through sort of chronologically to build up why the officer believed there was reasonable suspicion here. And I think, I know this court has pointed out that lawful driving isn't a factor contributing to reasonable suspicion, but you have to consider at the outset, this is a person whose car speed dramatically dropped by about 20 miles per hour. Ms. Boyle, let me ask you a follow-up question on that before you get to where you're going. Is it the government's position that reasonable suspicion here was not developed until about the seventh or eighth minute of the stop? And the reason I say that is we take the objective information that the officer knew when he pulled over the individual, right? Which there were factors that had already been relayed to the officer that the officer considered. When he pulled him over, let's make no mistake, he believed he was a drug courier or at least he thought he might be a drug courier based on reasonably articulable objective facts. Then almost immediately, he develops additional information including a California registration and an Arizona license plate, I'm sorry, an Arizona driver's license, insurance information that had been recently purchased. All of these things the officer can't ignore, I assume, right? So my question is, in this situation, are you saying that there was not reasonable suspicion until the seventh or eighth minute? Or are you saying sort of categorically by the seventh and eighth minute at the very outset, he had established reasonable suspicion? We're saying categorically at the seventh and eighth minute, there was reasonable suspicion. Certainly, I think there's an argument to be made reasonable suspicion existed earlier based on the facts particular to this stop. But we think it's just abundantly clear by that point as well. And you start with this idea that you have somebody who drops, it's certainly normal for a driver to drop to the speed limit if they see a law enforcement officer. We've all seen that happen on the highway. But this is a driver who drops 20 miles below the speed limit, which frankly is unsafe. We have him... He was driving above the minimum speed limit, however. I mean, the state of Illinois has specified the range. And he was within that range. He was, but Deputy Suttles also said that about 30 cars passed him. And, you know, it is unsafe not to be keeping up with traffic. And that is unusual. Some people who drive slowly, you know, maybe have had problem with their driver's license in the past, and they are in the side of caution. And I've seen people, you know, who just are uncomfortable driving. They're not experienced drivers. Maybe they're young, maybe they're old, maybe they just didn't drive much. All we knew from Suttles is that he's driving very low. He's got a bike rack in the back of his car. And then this, it seems to me, preposterous notion that driving a Volkswagen is some sort of the government... There's actually not a city whose population is below... Actually, I'll put it this way, whose population is above 100,000 that the government doesn't regard as a drug source. So it actually means that, in your view, you can't travel from anywhere to anywhere without traveling from a known drug place to a known drug place. So we need something other than that. And what we start out with is just the hunch of Suttles. No reasonable suspicion yet. We do have the check of the license and the registration. Maybe that justifies inquiry. Maybe a little better. Chapman sees all these food wrappers and junk in the car and only a backpack. Well, he might think, you know, if you're traveling, you know, 4,000 miles, maybe you need more than just a leg outside the car is ridiculous. But there are various factors. The recent nature of the registration might be something that is an objective factor. The account of the travel was not either confusing, evasive, or contradictory. He's absolutely consistent. And you seem to think it bad that he says over and over again that he's a chef. But he keeps being asked by Trooper Chapman. So what's he supposed to do? Say, hey, shut up. You know, I've already answered that question. No, of course not. He's going to politely answer again. Well, Your Honor, just to address your initial points, I want to say, you know, we're not trying to lean too hard into any particular factor here. This is a totality of the circumstances analysis where we're looking at any number of factors which could end all of these factors together. But many of them have zero weight. I mean, I just think the government needs to give up on this drug. Well, Ms. Boyle, I want to ask you a question. Does the government have knowledge that, like, particular types of automobiles are targeted by auto theft defendants because they're easier to steal? Like, let's say people looking to commit auto theft may target Cadillacs because they're easier to steal than Lincolns. That's true, isn't it? Your Honor, I think it's true. I don't have any knowledge of that. But in the drug trafficking world, DEA, the FBI, there are certainly types of cars that are manufactured that have spaces within them in which it's easier to build drug traps. Is that right? That's correct. And here we have Trooper Chapman testifying that Volkswagens are one of these vehicles. He mentions that at the scene of the stop, this is not a post-hoc rationalization. He mentions the exhaust pipe as being an area where drugs can be stored on Volkswagens. And they're also looking at the fact here that this is a cargo area. It's covered. They see the driver using an unusual posture, which Trooper Chapman has noticed before. Let me ask you about that unusual posture. What you're talking about is he's got the seat set way back. So you've got in a car next to the window, you've got between the drivers or between the front seat and the back seat, you've got a panel, right? And if you set the car way back, so you're sitting back, your face is obscured by that panel, right? So your face is not right in the window. So when you pass a police officer, you're obscured. The police officer cannot see who's driving the car. That's what you're referring to, right? That's correct, Your Honor. And it's a little weird because the person is driving often like this, right, with their arms fully extended and sitting way back in the car. And that is an objective fact that this officer considered. Is that what you're saying? That's correct, Your Honor. And he also was looking at his own knowledge and experience because he had seen people using that posture before and found them to be engaged in criminal activity. Hold on one second. And these troopers that engage in these drug interdiction on the highways to keep the highways safe, they go through extensive training based on experience. They're not just out there freelancing on drug interdiction. They're taught to look for certain objective factors that may or may not make it more difficult for them to get to the highway safely. And that's what you're referring to, right? That's correct, Your Honor. And this is an officer who's had, as you said, more than 250 hours of training. He's been a trooper for 15 years. He's been engaged in drug interdiction for that time. And he has made many of these stops. And he is aware of certain things that continue happening. Another thing he notes during the stop is Mr. Poole's nervousness. And, you know, it's not just the nervousness of an individual who's pulled over by law enforcement, which of course might happen to anybody. He says it's an unusual level of nervousness corresponding to past stops he has made. What are we to make of the video? I keep thinking of Scott versus Harris. You know, he said that. But you see him getting out of the car and walking over to the trooper's car. He doesn't look nervous in the slightest in that video. He just kind of pampers over there. So are we to Your Honor, I think we need to remember also that the magistrate judge found Trooper Chapman to be credible on the point that Mr. Poole was nervous. And that credibility determination is entitled to particular deference. Certainly we do see glimpses of Mr. Poole walking over to the car. And it's hard to evaluate his nervousness at that point. But we also hear him saying, we have testimony saying he was shifting his posture. But he doesn't say um any more than Trooper Chapman does. Yeah, the ums are about equal, I think. He sounds like he's questioning himself when he's telling his story. He says, yeah, the springs, it's all very hesitant. And we also have a credibility determination where the magistrate judge determined that Trooper Chapman had honestly reported Mr. Poole's level of nervousness. Then we have Mr. Poole followed too closely. We have his something. The recent registration is something you see with drug trafficking organizations. They re-register cars. They're not associated with a particular individual. And really this license, this discrepancy between the license and the registration adds to that idea. Maybe Mr. Poole has an Arizona license because, and maybe a third party registered the car because it's not really his car. We don't know how exactly this has happened. Ms. Boyle, I want to come back to, because you only have a little bit left, the test. And the government is arguing for a test that travel plan questions are generally within the mission of a traffic stop and generally appropriate. When do they cross a line? What's the test for that if there is one? Well, of course, the Fourth Amendment is always based on reasonableness. You have to evaluate within the facts of a particular stop when travel plan questions might go over the line. I would say an example of that may be at a point where it appears to be a straightforward stop. Defendant has presented paperwork all in order, no discrepancies. And the officer says, hey, where are you going? Where are you coming from? Both of which were pretty natural, general itinerary questions. And the defendant gives a plausible and non-vague answer. I also want to point out here that one of the purposes of the Fourth Amendment's exclusionary rule is to deter police misconduct. And if you look at the state of the case law at this particular time, Trooper Chapman was completely reasonable for Trooper Chapman to believe that these itinerary questions were appropriate under the existing case law. Your Honor, I see I'm out of time, but are there any further questions? Apparently not. Thank you. Thank you, Your Honors. Thank you very much. Mr. Hillis. Mr. Hillis, to follow up on that last line of questioning, are you aware of circuit court decisions that have expressly held that questions relating to travel plans are not typically within the mission of the traffic stop? No, because nobody has adopted a per se rule that they always are. So the courts are leaving the question open, Judge, and it is a fact-based inquiry. But are you aware of any circuit that has held they are generally not part of the mission? The courts that have talked about travel plan questions are the courts that have been identified in the government's brief. The important part in our view about those discussions are to look at back patterns and determinations. Was there already reasonable suspicion when they asked about travel plans? Were they simultaneously processing tickets when they asked about travel plans? When they say travel plans are permissible, it's after there's already been a determination that there's reasonable suspicion or an ongoing simultaneous effort to process the ticket. Of course, travel plan questions are permissible then. They're not prolonging them, Judge. So Rodriguez has not said categorically travel plans are permissible. The courts of appeals that have addressed the topic are subject to the restrictions that I just mentioned. The circuit courts haven't said that though. The ones that have addressed it have said exactly what we've been talking about, that generally questions related to an individual's traffic plans and itinerary are ordinary inquiries related to a traffic stop. The 11th Circuit just said that last month in a case not talking about reasonable suspicion but just about the scope of questions permissible as part of the mission. I'm not sure what particular case you're talking about. I will say the case of government sites. That was U.S. versus Brady, B-R-A-D-D-Y. The 11th Circuit just decided it last month. It's not cited by the government so I'm understandably flat-footed. Of the cases the government does say they are, I think, true to what I just explained, Judge. And so they don't advance the government's position here for this data. Judge Scudder, if I may pivot briefly to Johnson. Johnson is also going to be significant as to time. If the officer was processing a warrant doing a check of some other type that there's no problem asking that question or much of anything else of the passengers in Arizona versus Johnson. If it doesn't prolong the stop, there's not a violation under Rodriguez. We continue to come back to that. Can I ask you a follow-up, Mr. Hillis? It surprises me. I don't know if you're taking the broad position that so long as there's no prolongement, anything goes. No. For today, it's sufficient to say that that's all we need to address. But Judge St. Eve in her dissent acknowledged that there would be instances where questions go so far afield into a topic that is a separate investigation with different effects that may cause her to join with the majority in that case. I'm just saying for today, we don't need to answer that question, Judge. It would be an important question but it's not in this case. Is that satisfactory? Yeah, absolutely. That's totally fair. Thank you. So we have questions that are measurably prolonging the stop. They are repetitive. Each question adds to the length of the stop and it goes beyond what is necessary to effectuate the mission of the stop. We've never argued that there is a related travel or excuse me, public safety issue here. The government has never argued about a deterrent effect before. The exclusionary rule remains alive and well in the Supreme Court. We shouldn't be entertaining arguments first advance now an en banc supplemental briefing. So far, some reasonable suspicion things go. Judge Kirsch, you're concerned about obscuring himself, my client while he's driving. Trooper Chapman was at an overpass looking down at my client. He wasn't obscuring himself. I don't think he was even aware that Trooper Chapman was observing him. So he's not trying to obscure himself from the trooper. The trooper mentions about the VW being some sort of track car. He says that's based on what somebody told him who's there. Almost like rumor and idle chitchat. How many times has it been found in the VW? We have no idea. It is flimsy information and we have no idea about the extent of his training for that matter. Really, the government produced like a one page printout that had almost nothing in it to establish what this officer's training is. It was very inadequate. And ultimately, this is going to be a tough rule to announce if we're going to pass a new rule. But if we stick with the old rule, we're pretty good. Because Rodriguez told us what the parameters are. It doesn't green light travel plan questioning. We are in fact specific inquiries, which is common. District courts are well equipped to sort out these things. The government knows what it needs to do to meet its burden. Here, the officer pulled on the stop, asked repetitive questions. And I don't want to be more repetitive than the officer. So I'm going to end here unless the court has further questions. Thank you very much. Our thanks to both counsel for a well briefed and nicely argued case. The case is taken under advisement. The court is in recess.